DECISION
This is an appeal from the trial court's Findings, Entry and Decision denying a motion for class certification. Plaintiff-appellant Karen Hinkston, on behalf of herself and a class of similarly situated residents of Ohio, brought this action against The Finance Company (TFC), alleging violations of the Ohio Retail Installment Sales Act (ORISA). Hinkston alleged that all individual purchasers of used cars in Ohio that were financed by TFC during the limitations period paid a higher price than they would have if the cars had been sold for cash, and that these price increases were actually finance charges that were not disclosed in the sales contracts, as required by ORISA. Hinkston therefore claimed that she and others similarly situated were entitled to damages under ORISA. The trial court found that Hinkston had failed to satisfy all but one of seven prerequisites to maintaining a class action under Civ.R. 23. While we disagree with some of the trial court's findings, concluding that most of the prerequisites have been satisfied, we hold that the trial court did not abuse its discretion when it denied class certification, because the elements of predominance and superiority under Civ.R.23(B)(3) were not demonstrated. We also reject Hinkston's claim that the trial court erred in striking the affidavit of Hinkston's expert.
I. FACTS AND PROCEDURAL HISTORY
In June 1995, Hinkson decided to buy a 1988 Oldsmobile Cutlass from Mills Used Cars, Inc. While the car had a windshield price of $5,900, the salesman told her that she would have to be charged more because she "had bad credit." After discussing the higher price with her brother, Hinkston agreed to purchase the car for $7995. The retail installment contract reveals a "cash price" of $7995, plus taxes, fees and an extended service plan, less a down payment of $1300, leaving $8115.60 as the amount financed. The contract also sets forth a finance charge of $4122.78, the monthly payment amount, the annual percentage rate, and the total sale price. Hinkson made her monthly payments to TFC until she returned to Mills in July 1996 and traded in the Oldsmobile to purchase a Ford Escort.
At the time of Hinkston's original purchase, a Master Dealer Agreement was in effect between Mills and TFC, whereby TFC agreed to purchase retail installment contracts entered into between Mills and its customers. Under this agreement, TFC would review credit applications submitted by purchasers and pre-approve the applicant's credit and the terms of the sales contract. After the sale, TFC would purchase the contract from Mills at a discounted price.
The class of potential plaintiffs identified in this action consists of those who obtained financing from TFC for the purchase of used cars in Ohio from May 1991 to May 1997. In granting a motion to compel discovery, the trial court ordered TFC to provide information about the putative class only for the period May 1995 to May 1997.[1] Accordingly, TFC produced information about six hundred twenty-three customers who, during that two-year period, purchased used cars with financing from TFC from a total of twenty-three Ohio dealers.[2] In connection with the motion for class certification, Hinkston and TFC each submitted the affidavit of an economist. Each party also filed a motion to strike the affidavit of the other's expert. At the conclusion of argument on all of the motions, the trial court notified counsel by letter that it would deny the motion for class certification and grant both motions to strike the experts' affidavits. Pursuant to the trial court's request, counsel for TFC submitted an entry with proposed findings of fact and conclusions of law. Hinkston filed an objection, but the trial court adopted the entry as submitted. Hinkston's two assignments of error on appeal challenge, respectively, the trial court's denial of class certification and its decision to strike her expert's affidavit.
II. CLASS CERTIFICATION
A. Standard of Review
In Marks v. C.P. Chem. Co., Inc. (1987), 31 Ohio St.3d 200,509 N.E.2d 1249, syllabus, the court stated that "[a] trial judge has broad discretion in determining whether a class action may be maintained and that determination will not be disturbed absent a showing of an abuse of discretion." Further, due deference must be given to the trial court's decision. "It is at the trial level that decisions as to class definition and the scope of questions to be treated as class issues should be made. A finding of abuse of discretion, particularly if the trial court has refused to certify, should be made cautiously." Id. at 201,509 N.E.2d at 1252.
Hinkston argues that the first assignment of error should be reviewed on a de novo basis because the trial court did not actually exercise its discretion when it adopted the findings of fact and conclusions of law that were submitted by TFC's counsel. We do not agree. A trial court may adopt verbatim a party's proposed findings of fact and conclusions of law as its own if it has thoroughly read the document to ensure that it is completely accurate in fact and law. State v. Combs (1994), 100 Ohio App.3d 90,110, 652 N.E.2d 205, 218, citing Adkins v. Adkins (1988),43 Ohio App.3d 95, 97-98, 539 N.E.2d 686, 689; In Re Spears (Oct. 23, 1996), Adams App. No. 96 CA 1718, unreported. The decision in this case is accurate and consistent with the record, and the trial court did not err in adopting it.[3] Therefore, we may not disturb the trial court's denial of class-action certification absent a showing of an abuse of discretion.
B. Prerequisites to a Class Action
Before an action may be maintained as a class action, the plaintiff must show that all of the requirements of Civ.R. 23(A) and (B) are met; the failure to satisfy any one of the requirements will result in the denial of certification. Schmidtv. Avco Corp. (1984), 15 Ohio St.3d 310, 313, 473 N.E.2d 822,824. The requirements are as follows: (1) an identifiable class must exist and the definition of the class must be unambiguous; (2) the named representatives must be members of the class; (3) the class must be so numerous that joinder of all members is impracticable; (4) there must be questions of law or fact common to the class; (5) the claims or defenses of the representative parties must be typical of the claims or defenses of the class; (6) the representative parties must fairly and adequately protect the interests of the class; and (7) one of the three Civ.R. 23(B) requirements must be met. Hamilton v. Ohio Sav. Bank (1998),82 Ohio St.3d 67, 71, 694 N.E.2d 442, 448, citing Warner v. WasteMgt., Inc. (1988), 36 Ohio St.3d 91, 521 N.E.2d 1091; Civ.R. 23(A) and (B).
C. Application of Class-Action Requirements
1. Identifiable Class
The requirement that there be an identifiable class will be satisfied if the definition of the class is precise enough "to permit identification within a reasonable effort." Hamilton,supra at 72, 694 N.E.2d at 448, quoting Warner, supra at 96,521 N.E.2d at 1096. The test is whether there is a specified means of determining whether a particular individual is a member of the class. Planned Parenthood Assn. of Cincinnati, Inc. v. ProjectJericho (1990), 52 Ohio St.3d 56, 63, 556 N.E.2d 157, 165. The trial court found that Hinkston had failed to prove that there was an identifiable class, citing the unique facts involved in each individual's purchase of a used car. We do not agree, because "[t]he question as to whether there are differing factual and legal issues `does not enter into the analysis until the court begins to consider the Civ.R. 23(B)(3) requirement of predominance and superiority.'" Hamilton, supra at 73, 694 N.E.2d at 449, quoting Marks, supra at 202, 509 N.E.2d at 1253. A proposed class consisting of purchasers of used cars in Ohio that were financed by TFC during a specific period is readily identifiable from business records, and six hundred twenty-three potential plaintiffs have already been identified in records produced by TFC for a two-year period. Therefore, we conclude that the identifiable-class requirement has been satisfied.
2. Class Membership
The trial court found that Hinkston had proved she was a member of the class she sought to represent, and we agree.
3. Impracticality or Numerosity
Hinkson must also prove that the purported class is so numerous that joinder of all members is impracticable. Based upon its finding that the class was not identifiable, the trial court concluded that Hinkston had also failed to meet this requirement. However, the records produced by TFC reveal that there are at least six hundred twenty-three possible class members; this number alone is sufficient to establish that the class is so numerous that joinder of all members is impracticable. SeeHamilton, supra; Warner, supra.
4. Commonality
The requirement that there be questions of law or fact common to the class is generally given a permissive application. "It is not necessary that all the questions of law or fact raised in the dispute be common to all parties. If there is a common nucleus of operative facts, or a common liability issue, the rule is satisfied." Hamilton, supra at 77, 694 N.E.2d at 452; Marks, supra
at 202, 509 N.E.2d at 1252-1253. The issue of whether there are any additional questions affecting only individual class members does not enter the class-certification analysis until the Civ.R. 23(B)(3) requirements of predominance and superiority are applied. Id. Hinkston has identified at least a common nucleus of facts and a common liability issue, viz., whether credit purchasers paid higher prices for used cars, and whether any such price increases amounted to finance charges under the statute. Therefore, this requirement is also satisfied.
5. Typicality
"The requirement for typicality is met where there is no express conflict between the class representatives and the class."Hamilton, supra at 77, 694 N.E.2d at 452. The trial court did not apply this "no express conflict" standard when it wrote, "[I]t cannot be said that all proposed class members will make the same assertions as Plaintiff Hinkston." We do not find any apparent conflict between Hinkston's claim and the claims of those she seeks to represent, and we therefore conclude that she has met her burden with respect to this element.
6. Adequate Representation
A class representative is deemed adequate so long as his or her interest is not antagonistic to that of the other class members.Id., citing Warner, supra at 98, 521 N.E.2d at 1097; Marks, supra
at 202-203, 509 N.E.2d at 1253. The trial court found that Hinkston was not an adequate representative because she apparently did not comply with certain provisions of R.C. 1317.08 and 1317.032(C), which require that notice of a claim be given to a seller or holder of a retail installment contract before filing suit. However, notice under R.C. 1317.08 is not required where, as here, a willful violation of the statute is alleged; further, there is no indication or likelihood that the other class members gave such notice while Hinkston did not. Accordingly, these notice provisions do not render Hinkston's interest antagonistic to that of the other class members, and this requirement has also been met.
7. Application of Civ.R. 23(B) Class-Action Requirements
Hinkston must also show that this action comes within the purview of at least one of the three types of class actions described in Civ.R. 23(B). She claims that this case qualifies under Civ.R. 23(B)(3), which requires findings that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Under the rule, matters pertinent to those findings include the following:
 (a) the interest of members of the class in individually controlling the prosecution or defense of separate actions;
 (b) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;
 (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum;
 (d) the difficulties likely to be encountered in the management of a class action.
In determining whether common questions of law or fact predominate over individual issues, "it is not sufficient that common questions merely exist; rather, the common questions must represent a significant aspect of the case and they must be able to be resolved for all members of the class in a single adjudication." Schmidt, supra at 313, 473 N.E.2d at 825; see, also, Marks, supra at 204, 509 N.E.2d at 1254. Whether a class action is the superior method of adjudication requires a comparative evaluation of other available procedures to determine if the judicial time and energy involved would be justified. Id.
As stated above, Hinkston's claim is that individual purchasers of used cars in Ohio financed by TFC paid a higher price than they would have if the cars had been sold for cash, and that these price increases were actually finance charges that were not disclosed in the retail installment contracts, as required by ORISA. Much of the parties' arguments depends upon the "cash price" of each car. "Cash price" is defined in R.C. 1317.01(K) as follows:
 "Cash price" means the price measured in dollars, agreed upon in good faith by the parties as the price at which the specific goods which are the subject matter of any retail installment sale would be sold if such sale were a sale for cash to be paid upon delivery instead of a retail installment sale. "Cash price" may include sales taxes.
Hinkston's theory of the case, which has been labeled as her "economic theory," is that the best evidence of cash price is the amount of cash the dealer actually received for the car, viz., the down payment plus the amount paid by TFC for the contract. TFC argues, and the trial court concluded, that Hinkston's economic theory conflicts with the statutory definition of cash price and therefore cannot be accepted. The trial court also found that there were too many individualized determinations to be made for the transaction of each proposed plaintiff, so that common questions did not predominate over individual questions, and a class action was not superior to litigating the claims separately. The trial court further found that even if it had adopted Hinkston's economic theory, it would have reached the same conclusions.
To begin our review of the determination that common questions do not predominate over individual issues, we summarize the evidence in the record concerning the procedures used by TFC in financing used cars. There were various financing arrangements in place between TFC and the Ohio used-car dealers with which TFC dealt. Hinkston's car was financed under the Civilian Standard Program, under which TFC would buy the retail installment contract individually from the dealer at a discount and pay the dealer an "advance." The advance was calculated based on a number of factors, including the customer's credit history; the term of the loan; the annual percentage rate of the loan; the customer's employment status, ability to pay and character; and the amount financed, which in turn was based on down payment, sale price, taxes and fees, or other products such as extended warranties. Another of TFC's arrangements with dealers was the Credit Builder Program, used for high-credit-risk customers. Under this program, TFC would hold back, in a single reserve account, a portion of the amount financed for all of a dealer's Credit Builder contracts, and pay the dealer only when and if all of that dealer's Credit Builder contracts were paid. In the Refundable Reserve Program, TFC would retain a portion of the dealer's advance during the life of a certain contract to cover collection costs and repossession or delinquent fees, and refund to the dealer any amount remaining in that dealer's reserve account after all of the dealer's contracts were concluded.
This evidence reveals that many variables unrelated to the value or price of a car entered into the decision about how much money a dealer would receive from TFC in any given transaction, including the type of credit program in place between TFC and a given dealer, the length of the loan and the character of the purchaser. Therefore, contrary to Hinkston's economic theory, the amount received by a dealer from TFC is not an accurate indication of the cash price of a car. Further, Hinkston's economic theory conflicts with the definition of "cash price" in ORISA at R.C. 1317.01, because the amount received by the dealer from TFC and the down payment do not reflect the price agreed upon by the dealer and the purchaser.
Hinkston argues that the trial court was required to accept her economic theory, and that by rejecting it the trial court in essence ruled upon the merits of her claim. We do not agree. A court is not required to accept a theory of the case that conflicts with a provision of the Revised Code and that is presented in an attempt to simplify a case so that it may be presented as a class action. Hinkston's claims must be analyzed, in accordance with Ohio law, to determine whether the case should proceed as a class action. The merits of her claims do not enter into this analysis.
Moreover, whether or not Hinkston's economic theory is used, if the case were certified as a class action, the trial court would be required to conduct an individualized inquiry into the unique facts and circumstances surrounding the purchase and financing of each used car, to determine whether purchasers actually paid a higher price than they would have if the car had been sold for cash. For each transaction, it would have to be determined what factored into the price of each car. John Mills, owner of the dealership from which Ms. Hinkston purchased her cars, testified below that he could try to sell the same car to two different people and that he would not get the same price from both of them. He stated that the cash price was arrived at by free-will negotiation, and that he tried to get as much for a car as he could, whether it was sold for cash or credit.
In its decision, the trial court cited Gibson v. BobWatson Chevrolet-Geo, Inc. (C.A.7, 1997), 112 F.3d 283, in which it was alleged that a finance charge was concealed in a warranty charge, violating the federal Truth in Lending Act. The court stated that "[i]f a dealer merely charges what the traffic will bear, the fact that a particular credit customer may be paying a higher mark-up than a particular cash customer would not transform the difference in mark-ups into a finance charge; it would have in fact no causal relation to the extension of credit." Id. at 286. Whether a given mark-up amounts to a finance charge is a substantive question that is not before us in this class-action determination, but Gibson does support the conclusion that each transaction is different, depending upon the negotiating skills of the customer, the credit history and character of the customer, and the business practices of the dealer.[4] In this case, at least twenty-three dealers would have to testify about their business practices and the type of credit program used for each purchaser. Each purchaser would have to testify about the sticker price of the car, if any, whether that price changed during the negotiation, and what was revealed to him or her, to determine whether, as Hinkston claims, the purchasers paid a higher price than they would have if the cars had been sold for cash.
Because of the varying facts and circumstances involved in each transaction, this case is distinguishable from our recent decision in Begala v. PNC Bank (Dec. 30, 1999), Hamilton App. No. C-990033, unreported, and from the Ohio Supreme Court's decision in Hamilton v. Ohio Sav. Bank, (1998), 82 Ohio St.3d 67,694 N.E.2d 442. In Begala, the putative class consisted of PNC bank customers who accepted PNC's form-letter offer to postpone one monthly payment on their consumer loans and who alleged that PNC misrepresented the fees associated with its offer. We stated that allegations of misrepresentation in the form letter "distinguish this case from one in which various distinct misrepresentations were allegedly made to each member of the class." Begala, supra, slip op. at 7. In Hamilton, supra at 84, 694 N.E.2d at 456, the court stated that class-action treatment is appropriate where the claims arise from standardized forms or routinized procedures. In Hamilton and Begala, a single "seller" presented a form contract to all consumers in a similar transaction, with no negotiation as to the terms of the contract. Here, there are at least twenty-three used-car dealers with varying business practices situated between the defendant and the plaintiff-consumers, who had varying abilities to influence the terms of the contract.
Accordingly, we conclude that questions common to the members of the class do not predominate over questions affecting only individual members. We also determine that a class action is not superior to other available methods for the adjudication of the controversy. As set forth above in Civ.R.23(B)(3)(b), one of the matters pertinent to this issue is the extent and nature of any litigation concerning the controversy already commenced by or against members of the class. The trial court's decision notes that Hinkston's attorney had already filed eighteen similar claims in Hamilton County, suggesting little difficulty in the individual litigation of the claims. Other considerations set forth in the rule are the desirability or undesirability of concentrating litigation of the claims in a particular forum, and the difficulties likely to be encountered in the management of a class action. We agree with the trial court that management of this case as a class action would sorely tax the court's resources because it would require hearings concerning individual transactions and the business practices of at least twenty-three dealers located throughout Ohio. The claims are better suited for individual actions in the counties in which the dealers do business. Therefore, we hold that the trial court did not abuse its discretion in denying Hinkston's motion for class certification.
III. MOTION TO STRIKE EXPERT'S AFFIDAVIT
Hinkston's second assignment of error alleges that the trial court erred by striking the affidavit of her expert, Paul H. Rubin, an economist who supported her "economic theory" of the case. We need not reach the question of whether the trial court abused its discretion by striking this affidavit, because the expert's deposition remains part of the record, and the deposition reveals and discusses at length the substance of the affidavit. Therefore, there could be no prejudice to Hinkston resulting from the striking of the expert's affidavit. Cf. Hensley v. The NewAlbany Co. (Aug. 25, 1994), Franklin App. No. 93APE11-1562, unreported, appeal not allowed (1995), 71 Ohio St.3d 1458,644 N.E.2d 1030.
IV. CONCLUSION
For the reasons stated above, the two assignments of error are overruled and the judgment of the court of common pleas is affirmed.
Judgment affirmed.
 HILDEBRANDT, PJ., PAINTER and SHANNON, JJ.
Raymond E. Shannon, retired, of the First Appellate District, sitting by assignment.
[1] In defining this two-year period, the court cited R.C.1317.032, the provision of ORISA enabling a buyer in a consumer transaction to bring an action against an assignee of a retail installment contract, within the earlier of two years from the execution of the contract or the date of the last payment under the contract.
[2] While the trial court's decision states in passing that there are six hundred twenty-three transactions at issue in this case, the six-year period stated in the motion for class certification has not been formally limited.
[3] The only alleged inaccuracy in the decision concerns whether and when Hinkston asserted a "price raising theory" in addition to her "economic theory" of the case. Since the substance of both of these theories will be analyzed below in this decision, and were analyzed in the trial court's decision, we do not deem any discrepancy in the labeling of the theories to be a material issue.
[4] For example, Hinkston's contract states that the down payment was $1300, but she actually paid only $500.